UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| ASHANI ACKERMAN, *on behalf of herself and all others similarly situated*,<br>*Plaintiffs*,<br><br>v.<br><br>MAXIMUS EDUCATION, LLC,<br>*Defendant*. | No. 1:24-CV-00975-MSN-WBP |

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court on Defendant Maximus Education LLC's Motion to Dismiss for Lack of Subject Matter Jurisdiction (ECF 37). For the reasons outlined in this opinion, the Court finds that Plaintiff Ashani Ackerman has not presented facts to indicate that this Court has subject matter jurisdiction over her case, and accordingly, the Court will grant Defendant's Motion.

**I.   BACKGROUND**

    **A.   Factual Background**

Plaintiff took out several federal student loans between 2013 and 2021. ECF 50 ("Opp.") at 4. Until January 12, 2023, Defendant serviced eight such loan accounts for Plaintiff. *Id.* As of January 2023, the total balance of those accounts was roughly $25,000. During this time, and up until September 2023, all federal student loans, including Plaintiff's, were held in forbearance due to the COVID-19 pandemic, meaning that no payments were due or owing, and lenders or servicers could not make any negative credit reporting on those loans. ECF 38 ("MTD") at 5-6.

In early 2023, Plaintiff requested a discharge of her student loans based on total and permanent disability. ECF 50-2 at 3-4. On January 12, 2023, Defendant notified her by letter that

it had transferred those loans to another loan service provider to manage the discharge, and that she did not owe any further amount to Defendant. *Id.*

Despite Defendant's transfer of Plaintiff's loans, Defendant continued to report balances on those loans to credit reporting agencies ("CRAs"). *See* ECF 38-1, Ex. 1 at 11-25. Upset that Defendant was incorrectly reporting balances on her loan accounts, Plaintiff filed disputes with the CRAs, and Defendant received notifications of those disputes in the form of Automated Consumer Dispute Verifications ("ACDVs"). Opp. 5. Instead of correcting its reporting, Defendant verified to the CRAs that the non-zero balances on the accounts were correct. ECF 38-1, Ex. 1. Defendant eventually corrected the reporting to show $0.00 balances on each of the eight accounts, with Plaintiff's September 1, 2023 credit report showing as much. ECF 38-1, Ex. 3, at 8-18.

Between January 23, 2023 and June 6, 2023, ten different entities made inquiries into Plaintiff's credit with Equifax and TransUnion. ECF 38-1, Ex. 8 at 5-8. Plaintiff's Experian credit score on January 20, 2023 was 594. ECF 38-1, Ex. 1. Plaintiff's TransUnion credit score on September 1, 2023, was 514. ECF 38-1, Ex. 3, at 1.

During the time in which Plaintiff's loans were incorrectly showing a balance reporting, Plaintiff received several notices of adverse credit actions. On January 20, 2023, Plaintiff received an "adverse action notice" from Georgia's Own Credit Union, reporting that they denied her credit based on information received from Equifax, primarily relying on "Delinquent past or present credit obligations" and a "Decline by Chexsystems." ECF 38-1, Ex. 6, at 1. Plaintiff also claims in her interrogatory responses—but does not document—a January 23, 2023 personal loan denial by Excel Federal Credit Union, a March 30, 2023 denial of credit from Security Finance, an April 17, 2023 denial of credit from World Acceptance, a January 19, 2023 denial of credit from the Zip

app, and a January 12, 2023 denial of credit from PlanetFi. Opp. 8 (citing ECF 38-1, Ex. 8 at 6-7). Further, in an undated letter, an entity called "MAA Lenox" denied Plaintiff's home rental application, reporting that its decision was based on "consumer report(s) obtained from or through Saferent® Solutions LLC." ECF 38-1, Ex. 7.

### B. Procedural History

Plaintiff filed a proposed class action complaint on June 6, 2024, alleging a single violation of the Fair Credit Reporting Act, which in relevant part requires a furnisher of credit information, upon receipt of notice of a dispute through a CRA, to investigate and correct inaccurate information. ECF 1 ¶¶ 54-56. Plaintiff seeks to represent a class of individuals who.

> "(1) had federal student loan(s) serviced by Defendant; (2) which federal student loan(s) were transferred to another servicer; and (3) after which transfer, Defendant received notice from a consumer reporting agency of the individual's dispute concerning those federal student loan(s); but (4) in responding to the consumer reporting agency's notice of dispute, Defendant failed to report a $0 balance for those federal student loan(s)."

*Id.* ¶ 46. Defendant answered the Complaint on September 30, 2024. ECF 13. Magistrate Judge Porter approved a discovery plan on October 30, 2024. ECF 25. On November 8, 2024, Defendant moved to bifurcate discovery, seeking to proceed first with limited jurisdictional discovery regarding Plaintiff's standing to bring her claim. ECF 26. Judge Porter denied bifurcation but provided a briefing schedule for Defendant to move for dismissal for lack of subject jurisdiction, and for limited discovery while the motion is pending. ECF 33. Defendant moved for dismissal on November 29, 2024. ECF 37. That Motion has now been fully briefed and is ripe for resolution.

## II. LEGAL STANDARD

### A. 12(b)(1)

The issue of a Court's subject matter jurisdiction "may be raised at any time during the case." *Lovern v. Edwards*, 190 F.3d 648, 654 (4th Cir. 1999). A motion to dismiss for lack of

subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) may be facial or factual. *Oliver v. Virginia Bd. of Bar Examiners*, 312 F. Supp. 3d 515, 521 (E.D. Va. 2018). When a defendant brings a factual challenge, "the district court may then go beyond the allegations and resolve the jurisdictional facts in dispute by considering evidence outside the pleadings." *United States ex rel. Vuyyuru v. Jadhav*, 555 F.3d 337, 348 (4th Cir. 2008). "When jurisdictional facts are not intertwined with the merits, the trial court may weigh evidence and resolve factual disputes to determine its jurisdiction." *Kuntze v. Josh Ents., Inc.*, 365 F. Supp. 3d 630, 636 (E.D. Va. 2019). However, when those facts *are* intertwined with the merits, a district court may not weigh the evidence and resolve those facts. *Vuyyuru*, 555 F.3d at 348. Rather, it should apply a summary judgment standard and consider whether the Plaintiff has created a genuine issue of material fact as to the Court's jurisdiction. *Kuntze*, 365 F. Supp. 3d at 636 (citing *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991). In either case, the burden of establishing jurisdiction falls on the Plaintiff. *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994).

### B.   Article III Standing Under the FCRA

"Pursuant to Article III of the Constitution, federal courts have subject-matter jurisdiction over "Cases" and "Controversies." *Brown v. R & B Corp. of Va.*, 267 F. Supp. 3d 691, 695 (E.D. Va. 2017) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559 (1992)). "One component of the case or controversy limitation on jurisdiction is standing, which requires the plaintiff to allege such a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction." *Id.* (citing *Summers v. Earth Island Inst.* 555 U.S. 488, 493 (2009)) (cleaned up). To demonstrate standing, a plaintiff must show that she "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). This

4

requirement, including that the injury in fact be concrete and particularized, applies "even in the context of a statutory violation." *Id.* at 341. "[T]raditional tangible harms, such as physical harms and monetary harms" "readily qualify as concrete injuries." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021). And "various intangible harms," "[c]hief among them . . . injuries with a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts" such as "reputational harms" can be concrete. *Id.* In the context of reputational injury, the Supreme Court has held that "a person is injured when a defamatory statement 'that would subject him to hatred, contempt, or ridicule' is published to a third party." *Id.* at 432 (citation omitted). Under the causation prong of standing, a Plaintiff's injury must be "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560 (1992) (cleaned up) (citation omitted).

### III. ANALYSIS[1]

Here, the Parties appear to agree—though they do not specifically address the issue—that the Court should apply a summary judgment (rather than a preponderance of the evidence) standard in determining whether it possesses jurisdiction. Finding that the jurisdictional facts—which involve Plaintiff's damages and whether Defendant caused her harm through statutory violations— are sufficiently intertwined with the merits, the Court agrees that it must determine simply whether Plaintiff has created a genuine issue of fact as to jurisdiction. *See Kuntze*, 365 F. Supp. 3d at 636.

---

[1] In a proposed class action such as this, the named plaintiff "must allege and show that they personally have been injured." *Doe v. Obama*, 631 F.3d 157, 160 (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 40 n.20 (1976)). That is, "[w]ithout a sufficient allegation of harm to the named plaintiff in particular," the Court lacks jurisdiction over the case. *Id.* The only issue for the Court to decide is whether the single named plaintiff here can demonstrate standing, not whether other potential class-members would have standing to bring a claim.

Plaintiff identifies five different types of injury she claims confer standing: lost credit opportunities, a diminished credit score and profile, lost time, emotional distress, and intangible injuries akin to defamation or invasion of privacy. None is ultimately availing.

### A. Lost Credit Opportunities.

Defendant first argues that Plaintiff's allegations of lost credit opportunities are insufficient to support standing. MTD 12-16. While Defendant appears to acknowledge that a denial of a credit opportunity is a sufficiently concrete and particularized harm to confer standing, it contends that Plaintiff has not pointed to any evidence tending to show that those credit denials are fairly traceable to Defendant's actions.

Plaintiff has presented meaningful evidence as to just two credit denials. The first is the denial by the Georgia's Own credit union. But, as Defendant points out, the Georgia's Own denial identifies delinquent obligations and another recent credit denial as the reasons for its denial, *not* Plaintiff's student loan balances, which were not delinquent. MTD 13 (citing ECF 38-1, Ex. 6 at 1). Plaintiff's credit report shows Plaintiff was previously in bankruptcy and had several delinquent credit accounts. *Id*. Second, Plaintiff has presented the letter from MAA Lenox denying her rental application. That letter is more difficult to follow, but also provides no indication that her student loan balances were a cause of the denial. For one, the letter is undated—Plaintiff has claimed she received it at some unspecified date in "early 2023"—meaning it may well have been sent *before* Defendant failed to correct Plaintiff's loan balances. Second, MAA Lenox notes that it denied the application based on "consumer report(s) obtained from or through Saferent® Solutions LLC." ECF 38-1, Ex. 7. There is no indication in the record, however, that Saferent Solutions—which is not a CRA Plaintiff contacted—ever obtained inaccurate information from Defendant. Notably, Saferent Solutions is not listed as one of the entities that accessed Plaintiff's TransUnion or Equifax credit reports during the relevant timeframe. ECF 38-1, Ex. 8 at 5-8.

As for the other lost credit opportunities, Plaintiff has provided no detail beyond listing the name of the denying entity and the date in her supplemental interrogatory responses. ECF 38-1, Ex. 8 at 6-7. Without further detail, there is no evidence to indicate that Defendant's reporting played any role in those denials.

In response to these evidentiary deficiencies, Plaintiff argues that she has established a "plausible causal connection" between the inaccurate reporting and the denials, and that "the causation element of standing does not require the challenged action to be the sole or even the immediate cause of injury." Opp. 20 (citing *Sierra Club v. United States Dep't of the Interior*, 899 F.3d 260, 284 (4th Cir. 2018)). That is correct. But as described above, Plaintiff has not pointed to any evidence showing that Defendant's actions were a cause of the credit denials at all, much less the sole or the immediate cause of those denials.

At the end of the day, Plaintiff is left arguing that this Court should simply infer traceability, arguing "[i]t is entirely foreseeable that [a] potential lender or landlord [would] decline to extend a loan or enter into a lease with someone allegedly burdened by tens of thousands of dollars in federal student debt that must someday be repaid." Opp. 21. Were this Court deciding Defendant's motion on the pleadings alone, this might suffice. But here, Plaintiff has failed to meet her burden in response to a 12(b)(1) motion of pointing to *evidence*, as opposed to mere inference, that demonstrates a connection between Defendant's reporting and her injuries.

### B.   Plaintiff's Credit Score and Profile

Plaintiff also appears to suggest she suffered a concrete injury on the ground that "Defendant's inaccurate reporting that the Plaintiff owed an additional $25,000.00 unquestionably impacted her credit score," citing to a declaration from an expert in credit reporting. Opp. 17 (citing ECF 50-1 ¶ 11). That declaration, in turn, references an Experian website that says the "total amount you've borrowed affects your credit score." ECF 50-1 ¶ 11.

This argument is doubly flawed—Plaintiff can show neither traceability nor injury in fact. First, as to traceability, Plaintiff "has not provided any facts or evidence explaining" how the false reporting "had any effect on her 'credit score' or profile." MTD 16. Indeed, the only record evidence regarding Plaintiff's credit score shows a *decrease* after Defendant began correctly reporting her loan balances. ECF 38-1, Ex. 6 at 2; ECF 38-1, Ex. 3, at 1.[2] Plaintiff's citation to an Experian web page explaining that credit balance *may* factor into one's score is insufficient to show as a factual matter that the balances Defendant reported *did* negatively impact her score.

Moreover, even if such evidence existed, Plaintiff has not pointed to any law showing that a decline in her credit score constitutes a concrete and particularized injury. This is unsurprising, as courts have tended to hold that a lower credit score on its own is insufficient to demonstrate injury in fact. *Zlotnick v. Equifax Inf. Servs., LLC*, 583 F. Supp. 3d 377, 392 (E.D.N.Y. 2022). Accordingly, Plaintiff cannot rely on claims of harm to her credit profile alone to establish standing.

### C.  Lost Time and Emotional Distress

Plaintiff also argues she has standing because she spent time seeking to correct the incorrect reporting and suffered emotional injury due to Defendant's actions. As for lost time, she claims in her interrogatory responses that she "expended time and financial resources in the course of repeated disputes of the inaccurate balance information," ECF 38-1, Ex. 5 at 7, and that the Defendant "received 48 [disputes] regarding [Plaintiff's] accounts between January 18, 2023 and February 19, 2023," ECF 50-1 ¶ 17.[3] This claim is, like Plaintiff's others, deficient in factual detail.

---

[2] This evidence is of limited value, given that the scores compared are from two different CRAs. Nonetheless, it is *Plaintiff's* burden to show injury, and her inability to provide the evidence demonstrating an effect on her credit scores.

[3] Defendant points out that Plaintiff's claim she submitted "48 disputes" may be misleading. "Plaintiff had eight loans at issue and appears to have submitted the same dispute for each of these loans across the three major credit bureaus. So . . . the reality is Plaintiff disputed her eight loans across three different bureaus on two occasions. Plaintiff declined to submit a declaration herself explaining her own alleged lost time and resources." Reply 10.

8

As Defendant puts it, "Plaintiff is required to come forward with facts, not allegations, and her inability to support her claims of lost 'time or resources' is fatal to her Article III standing." MTD 18. As this Court has found, such a "bare allegation of lost time alone fails to support a finding of concrete harm for standing purposes." *Id.* (citing *Reimer v. LexisNexis Risk Sols., Inc.*, 2022 WL 4227231, at *9 (E.D. Va. Sept. 13, 2022)). The Fourth Circuit too, has held that a plaintiff is "not entitled to 'rest on such mere allegations, but must set forth by affidavit or other evidence *specific facts*, which for purposes of [a 12(b)(1)] motion will be taken to be true.'" *Beck v. McDonald*, 848 F.3d 262, 270 (4th Cir. 2017) (emphasis added). Here, Plaintiff's allegations of lost time lack any such factual grounding.

The same goes for Plaintiff's claims of "emotional and mental distress," which amount to nothing more than those four words in her interrogatory responses. ECF 38-1, Ex. 8, at 6. Plaintiff had ample opportunity to present specific factual allegations regarding her emotional distress, as Defendant requested Plaintiff produce any medical records regarding such distress. Her failure to do so means she may not now claim standing on account of her supposed emotional and mental injuries. ECF 38-1, Ex. 10, at 7.

### D. Intangible Injuries.

Last is the issue of Plaintiff's claimed intangible injuries. Plaintiff argues that absent any concrete injuries that are traceable to Defendant's conduct, Defendant's actions caused intangible injuries akin to those redressable at common law for tort claims of defamation or invasion of privacy. On closer examination of Supreme Court precedent and the common law, however, Plaintiff has fallen short of establishing that the false communication to CRAs and potential creditors that she owed but was not delinquent in paying $25,000 in student loans would have been actionable at common law.

9

1. **Defamation**

Plaintiff first argues that Defendant's continuing to "falsely report that Plaintiff owed it approximately $25,000.00" is "unquestionably sufficient for standing" under *TransUnion*. Opp. 12. That is certainly an overstatement. As Defendant points out, the relevant question is whether the false report bears "a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts." *TransUnion*, 594 U.S. at 431. In *TransUnion*, the Court found that "longstanding American law" saw defamatory injury where a Defendant published a statement "that would subject [a Plaintiff] to hatred, contempt, or ridicule." *Id.* at 432. The Court there determined that falsely labeling Plaintiffs "as potential terrorists, drug traffickers, or serious criminals" met this test and the Plaintiffs thus "suffered a concrete harm that qualifie[d] as an injury in fact." *Id.*

Here, the Defendant did not report that Plaintiff was a terrorist, drug trafficker, or serious criminal. Nevertheless, Plaintiff suggests that *TransUnion* precedent establishes she suffered defamatory injury because Defendant falsely reported $25,000 in outstanding student loan balances. She leans heavily on the Seventh Circuit's decision in *Ewing v. MED-1 Sols., LLC*, 24 F.4th 1146 (7th Cir. 2022). Opp. 13. There, a plaintiff disputed a debt collector's claim, but the collector failed to note that dispute to the CRAs. 24 F.4th at 1149. Following *TransUnion*, the Seventh Circuit found an injury akin to defamation there because "being portrayed as a deadbeat who does not pay her debts has real-world consequences." *Id.* at 1154. But *Ewing* is distinguishable. Defendant's report, contrary to that in *Ewing*, did not portray Plaintiff as a "deadbeat" or delinquent in any way, and is therefore less closely related to the type of falsehoods that could subject Plaintiff to "hatred, contempt, or ridicule."

Distinguishing Plaintiff's claims from those in *Ewing* is helpful to Defendant, but insufficient to resolve this case. While Plaintiff's injuries are plainly less akin to defamatory

injuries at common law than those of the plaintiffs in *TransUnion* or *Ewing*, merely comparing them does not answer the question of whether her injuries are akin to those actionable at common law.

Unfortunately for Plaintiff, the common law too supports Defendant's position. This Court is aware of just one case that has addressed this question in the post-*TransUnion* standing context. In a dissent, Judge Tjoflat of the Eleventh Circuit examined the common law of libel, which considered "what is highly offensive to a reasonable person," and found that "courts generally have not considered disclosure of debt to be libelous per se." *Hunstein v. Preferred Collection and Mgmt. Servs., Inc.*, 17 F.4th 1016, 1043 n.7 (11th Cir. 2021) (Tjoflat, J., dissenting) (citing 53 C.J.S. Libel and Slander, § 47; 17 Ruling Case Law, 300); *reh'g en banc granted, opinion vacated*, 17 F.4th 1103 (11th Cir. 2021).

Secondary sources—including those that Judge Tjoflat cites—support this finding. The Corpus Juris Secundum found that as "a general rule, however, where the charge or imputation does not affect the person in a business, vocation, or profession, it is not libelous per se merely to publish a statement that the person owes money . . . . Such a charge or imputation is actionable as libel only where it has caused special damages to the plaintiff and was made maliciously or in bad faith." 53 C.J.S. Libel and Slander, § 47. Another treatise wrote that "[a] mere statement that the defendant wants the plaintiff to pay his honest debts . . . has been held not slanderous, on the ground that such a charge imputes no dishonorable conduct to the plaintiff," and even that "[a] writing containing the mere statement that a person . . . owes a debt and refuses to pay . . . *does not* in a legal sense necessarily expose the person of whom it is said to public *hatred, contempt, or ridicule*." 17 Ruling Case Law, 299-300 (emphasis added).

11

Even more helpful is a 1965 American Law Reports collecting cases along these lines. Notably, it found that "[i]n several jurisdictions the courts have specifically ruled that it is not libelous per se to list a nontrader as a delinquent debtor in a publication designed for circulation among merchants and similar creditors." 99 A.L.R.2d 700 § 3(a). That is, many courts have determined that even portraying a plaintiff as a *deadbeat* debtor was not libelous at common law. Other courts went in the opposite direction, finding that "[a]n imputation, as made through a trade listing, that a debtor refuses to pay his obligations . . . has been successfully used as the basis of a libel action." *Id.* § 3(b). But the report identified *no* case in which the mere reporting of *non-delinquent* debt by one not in a trade or profession can constitute libel per se.[4]

It is therefore evident that Courts at common law did not tend to consider a statement that a person owes debts to be defamatory without more. Indeed, even portraying a debtor as a "deadbeat" was not always sufficient to make out a defamation claim. Thus, because Defendant's actions—especially considering Plaintiff's entire credit report—did not appreciably injure her reputation, she cannot establish standing in the matter of the plaintiffs in *TransUnion*.

2. **False Light.**

Finally, Plaintiff also appears to claim that Defendant's incorrect reporting of loan balances is similar to the invasion of privacy tort of placing her in a false light. Opp. 16. But the false light version of the tort of invasion of privacy requires publicity, which "means that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge." Restatement (Second) of

---

[4] The analyses in cases cited by the A.L.R. are instructive. In one case, the Minnesota Supreme Court found that an "indicat[ion] that the plaintiff did not always pay . . . his bills promptly" but did pay "without the necessity of taking legal proceedings . . . did not appreciably injure his reputation." Id. § 4 (citing *McDermott v. Union Credit Co.*, 76 Minn. 84 (1899)). And in a Tennessee case, the court held "that the publication, in an abstract of unsettled accounts issued by a commercial agency for the exclusive use and benefit of the paying subscribers, of a memorandum that the plaintiff, who was neither a merchant nor a trader, was indebted in a certain sum, was not libelous per se, since the publication on its face was not injurious." Id. (citing *Fry v. McCord*, 95 Tenn. 678 (1895)).

12

Torts § 652D (1977); *see id.* § 652E (referencing § 652D for definition of publicity). Plaintiff here has alleged no such publicity, so cannot establish an injury analogous to false light.

## IV. CONCLUSION

For the foregoing reasons, Plaintiff has not shown that she has standing to bring her claim that Defendant violated the FCRA. Therefore, it is hereby

**ORDERED** that Defendant's Motion to Dismiss for Lack of Subject Matter Jurisdiction (ECF 37) is **GRANTED**; and it is further

**ORDERED** that Plaintiff's Complaint is **DISMISSED** without prejudice.

The Clerk is directed to close this civil action.

**SO ORDERED.**

/s/
Michael S. Nachmanoff
United States District Judge

January 8, 2025
Alexandria, Virginia

13